UNITED STATES of America, Plaintiff-Appellee,

v.

H. P. DAVIS, Arnold Harkless, Jr., and Billy Earl Clayton, Defendants-Appellants.

No. 77–5652.

United States Court of Appeals, Fifth Circuit.

Oct. 25, 1978.

Arnold Harkless, Jr., pro se.

H. P. Davis, pro se.

Billy Earl Clayton, pro se.

Donald O. Ferguson, San Antonio, Tex. (Court-appointed), for Davis.

Raul Rivera, San Antonio, Tex. (Court-appointed), for Clayton.

J. Douglas McGuire, San Antonio, Tex. (Court-appointed), for Harkless.

Jamie C. Boyd, U. S. Atty., LeRoy M. Jahn, Asst. U. S. Atty., Robert S. Bennett, Trial Atty., San Antonio, Tex., for plaintiff-appellee.

Before TJOFLAT and HILL, Circuit Judges, and HIGGINBOTHAM,* District Judge.

* District Judge of the Northern District of Texas, sitting by designation.

1. *See Curtis v. United States*, 546 F.2d 1188 (5th Cir. 1977), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977).

2. Because defendants presented a common defense at trial and have filed a joint brief on

PATRICK E. HIGGINBOTHAM, District Judge:

Defendants H. P. Davis, Billy Earl Clayton, and Arnold Harkless, Jr. were convicted in the Western District of Texas of conspiracy to possess heroin with the intent to distribute, in violation of 21 U.S.C. § 846, and possession with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Each received sentences of ten years on each charge to be served consecutively.[1] They join in this appeal.[2] The defendants' complaints fall into three groups: (1) failure of the prosecution to disclose a plea agreement with its chief witness; (2) the denial of four pretrial motions; and (3) evidentiary rulings. For the reasons that follow, we reject these claims of error and affirm.

The three defendants were indicted on May 10, 1977, and all entered pleas of not guilty on May 20, 1977. Defendants later filed numerous pretrial motions. The parties appeared on June 1 and the trial was scheduled for July 11, 1977. On July 11 the case was called to trial, a jury was selected, and the case was commenced two days later on July 13. After a trial of less than one day and jury deliberations of less than one hour, the defendants were found guilty on both counts.

One of the government's key witnesses was a 61-year old male named Kinslo Davis. He testified that on Sunday, April 17, 1977, he received a telephone call from a man who identified himself as "Hawk's cousin." Hawk had purchased heroin from Kinslo Davis at other times. Hawk's cousin asked and Kinslo Davis answered that he could furnish heroin if "the man" was available. It later developed that "Hawk's cousin" is the defendant, H. P. Davis.

The following Tuesday morning Kinslo Davis received a second call from H. P.

appeal, they will not be treated separately except where necessary to explain the events below. There is no suggestion that any error presently asserted was not preserved for all defendants. They stand or fall together. Defendants' *pro se* briefs raise no significant issues not discussed in this opinion.

Davis asking if he had the heroin. On learning that Kinslo Davis had made contact with "the man", H. P. Davis stated that he would come to San Antonio from Houston that day. H. P. Davis arrived in San Antonio and telephoned Kinslo Davis at the Hackberry Street Bar. Kinslo Davis instructed the defendants to meet him at a certain washateria and learned that he could identify H. P. Davis as the driver of a black and gold pickup truck. Unknown to Kinslo Davis, and unfortunate for H. P. Davis and his compatriots, D.E.A. agents had the Hackberry Street Bar under surveillance. The agents observed Kinslo Davis leave the bar. Following Kinslo Davis, the agents observed him pull his Cadillac behind the black and gold pickup. While the surveillance continued, H. P. Davis got out of the pickup and joined Kinslo Davis in the Cadillac. H. P. Davis asked Kinslo Davis if he had "the stuff." Kinslo Davis said that he did. H. P. Davis had the money. The pickup and the Cadillac departed to a nearby park where the vehicles were parked side by side. There defendants Clayton and H. P. Davis left the pickup and joined Kinslo Davis in the Cadillac, tendering the purchase money for two ounces of heroin; Kinslo Davis immediately found it $50 short of the agreed upon $1,200. H. P. Davis left the Cadillac, returned to the pickup, obtained the additional $50 from the defendant Harkless, and returned to the vehicle. The money delivered to Kinslo Davis was in small denominations, mostly $10's, but none larger than a $50 note. All parties left the park, followed by the same D.E.A. agents. Kinslo Davis then delivered $1,200 he had just received from defendants to Rogelio Galindo, his source. Kinslo Davis had been a heroin runner for Galindo for some period of time during which he had been entrusted with substantial quantities of drugs and money. After he handed the money over to Galindo, Kinslo Davis was arrested at a supermarket.

Surveillance agents also followed the pickup truck (containing defendants H. P. Davis, Harkless, and Clayton) to Interstate Highway 10 where the agents were satisfied it was heading east towards Houston, Texas. Later that evening, acting on the information of agents in San Antonio, Officer B. J. Gallatin of the Houston Police Department spotted the truck on Interstate 10 and in the city limits of Houston. During an ensuing high speed chase two objects were thrown from the pickup truck by the passenger on its right side. One of the objects struck the windshield of Officer Gallatin's car in a burst of powder. The other object went over the top of the police car. Another police vehicle stopped and recovered the packets thrown from the pickup during the chase. Although the officer recovered only one-third of the packet which struck the windshield, he retrieved the other packet intact. Officer Gallatin succeeded in stopping the vehicle and was joined at the arrest site by Officer Harrison who had recovered the heroin. As he approached H. P. Davis, H. P. Davis volunteered "Officer Harrison, I guess you have me this time." The packets contained 30.5 grams of 1.6% heroin. According to the testimony of Houston police officials, the quantity could be divided into approximately 110 foil packets or "balloons" with a resale value of approximately $50 each, aggregating a resale price of some $5,000.

The first group of errors urged by defendants revolves around a factual assertion that Kinslo Davis had entered into a plea bargain arrangement not revealed to defendants. Such nondisclosure upon the request of the accused would violate due process, offend the rules of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and in general suggest acute problems of prosecutorial misconduct.

■ These claims can be quickly dispatched. The record contains no evidence of any undisclosed plea arrangement between Kinslo Davis and the government. Defendants argue, however, that this court need not limit itself to the contents of the record. Pointing to events occurring after the trial and outside the record on appeal, they urge that Kinslo Davis' later plea to one felony count of an indictment and his

four year sentence demonstrates that at the time of the trial, a secret deal was in existence. They contend that under *Ring v. United States*, 419 U.S. 18, 95 S.Ct. 164, 42 L.Ed.2d 29 (1974), these post trial events require this court to reverse their convictions. *Ring*, a *per curiam* opinion vacating an unreported Fifth Circuit decision, does not support defendants' position. In *Ring*, as here, the trial record contained no indication that the prosecution had withheld exculpatory evidence. The Solicitor General conceded on appeal, however, that the prosecutor's records revealed plea bargaining not disclosed at trial. The Supreme Court, without explanation, remanded the case to allow that evidence to be offered into the record. Although the opinion does not so specify, *Ring* falls into that category of cases confronting confessed error in which appellate courts are obliged independently to examine the error confessed in order to determine whether its magnitude is sufficient to justify remand. *See Young v. United States*, 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942). The government has not here confessed any error or conceded facts that raise sufficiently serious questions to justify remand. Defendants are, of course, free to proceed before the trial court to develop factual support for their present suspicions that now appear to spring from no more than a possible later plea and favorable sentence of Kinslo Davis. *See* 28 U.S.C. § 2255.

Second, defendants urge the trial court erred in denying motions for a bill of particulars, for appointment of investigator at the government's expense, for an independent chemical analysis, and for severance. ▮ Defendants contend that the trial court by not ordering a bill of particulars prevented their gaining sufficient knowledge of the offenses to prepare their defense. The purpose of a bill of particulars is to inform an accused of the charge with sufficient precision to reduce trial surprise, to enable adequate defense preparation, and critically, by the fleshing out of the charges to illuminate the dimensions of jeopardy. *United States v. Mackey*, 551

F.2d 967, 970 (5th Cir. 1977); *United States v. Sherriff*, 546 F.2d 604, 606 (5th Cir. 1977). The determination of whether a given bill falls within or exceeds these permissible purposes is seldom subject to precise line drawing. More often it is an exercise calling for discrete decisions properly infused with the ambience of the trial scene and tailored to fit the facts before the trial judge. Not surprisingly then, in passing on motions for a bill of particulars, a trial court is afforded substantial discretion. When appellants are unable to demonstrate any prejudice or point to the withholding of any fact or information which caused actual surprise or injury, they have not demonstrated abuse of that discretion. Defendants have so failed. It is true that conspiracy with which defendants were charged can in some cases be complex. In this case, however, the factual makeup of the conspiracy was simple and the charged heroin distribution pattern was wholly of a garden variety. Furthermore, it is well established that generalized discovery is not a permissible goal of a bill of particulars. Curiously, defendants concede that their purpose in filing a bill of particulars was to obtain such discovery.

▮ An appellate court may review a trial court's refusal to appoint an investigator pursuant to 18 U.S.C. § 3006A(e) "in light of only the information available to the trial court at the time it acted on the motion." *United States v. Theriault*, 440 F.2d 713, 715 (5th Cir. 1971), *cert. denied*, 411 U.S. 984, 93 S.Ct. 2278, 36 L.Ed.2d 960 (1973). When requesting investigative services, a defendant must show specifically the reasons why the services are necessary. *United States v. Mundt*, 508 F.2d 904, 908 (10th Cir.), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1682, 49 L.Ed.2d 103 (1974). Although asked directly by the trial court for the purpose of the requested investigator, defendants' counsel gave little assistance. Defendants did state that the investigator might contact potential witnesses, but they did not mention the relevance of these witnesses, point to any particular lead which needed to be pursued, or explain what in-

vestigative efforts had been exhausted. The trial court did not abuse its discretion in denying this motion and no prejudice has been shown.

■ Defendants' contention that the trial court erred by not ordering independent laboratory examination of the narcotics at government expense is without factual foundation. On June 6, 1977, one month before trial, the trial court entered an order granting a defense motion for independent laboratory analysis of the narcotics. Immediately before trial, defendants' counsel informed the court that no analysis had been performed, explaining that "there was no laboratory in the State of Texas that could identify that low of a percentage of heroin." Defendants now urge that they failed to obtain the test because the trial court order granting the motion for independent laboratory analysis did not impose the expense of the test on the government. Had defendants obtained the analysis, there is every indication that the expense would have been borne by the government. The defense motion originally filed and granted was entitled "Motion by Indigent Defendant for Independent Chemical Analysis," counsel were court-appointed and the defendants were proceeding *in forma pauperis*. Finally, the record discloses that defendants' counsel never objected to the order. The sum of the record is that defendants complain here of denied relief they led the trial court to believe was granted. There was no adverse ruling to appeal.

■ Defendants next contend that the trial court erred in denying a motion for severance of their trial from that of codefendant Rogelio Galindo, the heroin source. The trial court has substantial discretion to sever properly joined defendants under Rule 14, Fed.R.Crim.P. *United States v. Smith*, 550 F.2d 277, 283 (5th Cir. 1977), *cert. denied*, 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105 (1978). A demonstration of abuse of that discretion at the least requires a showing of prejudice. *United States v. Strand*, 517 F.2d 711, 714 (5th Cir.), *cert. denied*, 423 U.S. 998, 96 S.Ct. 428, 46 L.Ed.2d 373 (1975). Galindo pled guilty be-

fore trial and was not tried with the defendants. As a result of his guilty plea, Galindo played no greater role in defendants' trial than he would have had the court granted the motion to sever. Defendants therefore have failed to demonstrate prejudice.

■ Defendants' final group of claimed errors relates to matters of evidence. First it is urged that the trial court's admission into evidence of the $1,200 was both irrelevant and prejudicial. The money, however, was directly pertinent to issues in the case and its probative value outweighs any possible prejudice it may have caused. Kinslo Davis testified to the denominations of the money that the defendants had paid him. He was under surveillance from the time he received the money until the time he delivered it to Rogelio Galindo. After the arrest of Rogelio Galindo, the $1,200 was found in the pocket of a coat hanging in Galindo's bedroom closet. Kinslo Davis testified that Galindo was his source, and that that day, before Davis' meeting with defendants, Galindo had given him two ounces of heroin for delivery. The money provided tangible corroboration of Kinslo Davis' testimony and undermined the defensive theory that the drugs had been planted by the Houston police officers. It follows that in admitting the money into evidence the trial court did not abuse its discretion. *United States v. Johnson*, 558 F.2d 744, 746 (5th Cir. 1977), *cert. denied*, 434 U.S. 1065, 98 S.Ct. 1241, 55 L.Ed.2d 766 (1978).

■ Finally, defendants urge that there is insufficient evidence to support their convictions of possession with intent to distribute. The two ounces of heroin that defendants purchased in San Antonio, Texas, and transported to Houston, Texas, are subject to redistribution in the Houston market in smaller units referred to as "balloons", for an aggregate resale price of some $5,000. This would represent a gross profit of $3,000. Viewing this evidence in the light most favorable to the jury's verdict, the government has met its burden. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). For these

reasons the convictions and the sentences imposed in this case are AFFIRMED.